HIPP, administrator, *v.* FIDELITY MUTUAL LIFE INSUR-- ANCE COMPANY.

1. Where a policy of life-insurance provided that the contract should not be operative or binding until the actual payment of the initial premium and delivery of the policy, the company could have insisted upon this. But if instead it delivered the policy, took notes for the initial premium, payable one each month for six months, and gave to the insured a receipt for the premium payable in advance, containing the clause, "the above premium settled by note," this was a waiver of the payment in cash in advance, and an acceptance of the notes in lieu thereof; and the policy took effect. ·

2. Where the policy and each of the notes so taken provided that if any obligation given for premiums should be dishonored or not paid when due, the policy should be void until duly reinstated during the lifetime and good health of the insured, in the manner prescribed, upon the failure to pay a note given for a premium the policy became void. And if not reinstated before the death of the insured, no right of recovery upon it existed.

3. Although at the time when a premium note fell due the insured was sick and unable to attend to business, and so remained until he died, this would not prevent the policy from being forfeited for non-payment, in accordance with the express terms contained in it and in the premium note.

4. Where such a note was not on its face payable or to be negotiated at bank, but it was in fact sent through a bank for collection, the insured would be entitled to the entire day of maturity in which to make payment, without a forfeiture resulting from default in payment; and his right to pay would not be terminated at the close of banking hours.

5. Where a note on its face was made payable in a named city, and the· maker added to his signature a certain address in that city, presentation of the note at the address so given, in the absence of any change of address and notice thereof to the payee or holder, would be sufficient, although the maker was on that day absent from the city.

6. Where a brother of the insured, after banking hours, heard that such a note was in the bank and went there, but found it closed, and also went to the office of the local agent of the company, but found it likewise closed, such a voluntary act on his part, not as the agent of the insured, did not prevent a forfeiture, although he testified that his intention was to pay the note for the insured.

7. Nor would a voluntary inquiry by the brother of the insured, made at the bank several days after the maturity of the note, and after it had

been dishonored and returned to the company, and an offer to then pay the local agent, suffice to reinstate the policy or prevent a forfeiture.

8. Where a "rider" attached to a life policy provided that upon acceptance by the company of due and satisfactory proof of the total and permanent blindness or deafness of the insured, or that he had become totally and permanently incapacitated either by accident or bodily or mental disorder, in lieu of other benefits and advantages under the policy he should be entitled to either one of two options, but it did not appear that any such proof had been received or accepted by the company, or that either of the options had been exercised, this was not sufficient to show that the terms of the original policy had been changed and the benefits provided under either of such options had become of force.

9. Where one of such options was to the effect that from the date of such proof the premiums payable for the remaining years should cease, or be remitted during the continuance of the incapacity, and that the insurance should be paid as an endowment at the age of eighty, or at death if before that age, the fact that the insured was sick with typhoid fever when one of the premium notes fell due, and that he so remained until his death some weeks thereafter, was not alone sufficient to make the option take effect.

10. Where the notes given in lieu of the prepayment of the cash premium provided that if any of them was not paid at maturity, without grace, the policy should be forfeited, and there was no question as to the identity of the notes so given, or of any fraudulent purpose, the mere insertion of a pencil memorandum of the number of the policy in a blank in each of the notes left for that purpose, such insertion being made in pencil by an agent of the company after the notes were signed, did not prevent them from being introduced in evidence, or the condition for forfeiture from being enforced.

Argued May 21,—Decided June 14, 1907.

Action on insurance policy. Before Judge Little. Muscogee superior court. June 23, 1906.

On May 17, 1904, the Fidelity Mutual Life Insurance Company issued a policy of insurance upon the life of Glenn H. Hipp, recited to be of Macon, Bibb County, Georgia. It was made payable to his mother, or, if he survived her, to his administrators, executors, or assigns. It was declared that the contract was made for the term of six years, and renewable thereafter at the option of the insured, in consideration of the written application and the payment in advance of $67.40 upon the delivery of the policy, and the same amount thereafter at the company's head office in the City of Philadelphia upon the 17th day of May in every year until the premiums for five years had been paid, and thereafter of $100.50 each year during the continuance of the contract. One

of the conditions of the policy provided, that the contract should not be operative or binding until the actual payment of the initial premium and delivery of the policy during the lifetime and good health of the insured; and that "if any premium be not paid when due, or if any obligation given for premium be dishonored or not paid when due, this policy shall be void until duly reinstated during the lifetime and good health of the insured. . . Or if any obligation given for premium be dishonored or not paid when due, without grace, this policy shall be absolutely void, except as provided in the non-forfeiture clause. . . it can only be revived if the insured be in good health upon presentation of a reinstatement certificate signed by said insured, and upon the approval of the same by the President or Vice-President and Medical Director, but not otherwise." Attached to the policy, and forming a part thereof, was what was termed, "An ordinary life elective-life rider." One of the provisions of this was as follows: "That any time upon acceptance of due and satisfactory proof of the total and permanent blindness or deafness of the insured thereunder, or that said insured has become totally and permanently incapacitated either by accident or bodily or mental disorder, the said insured, in lieu of all other benefits and advantages accruing under said policy or under its non-forfeiture provisions as modified above, shall be entitled to either of the following options: (A) From the date of said proof the premiums payable, if any, for the remaining years shall cease, or be remitted, during the continuance of the incapacity, and the insurance shall be payable as an endowment at the age of eighty, or at death if prior, unless extended insurance shall have previously been put in force under the non-forfeiture provisions as set forth in the first section hereof." The other option allowed was the exchange of the policy for a life annuity. The insured did not pay any premium in cash, but the policy was delivered to him together with a receipt for such premium, and notes were given by him therefor (except that there was a slight inaccuracy in the amount). They were made payable to the maker's own order and indorsed by him, and were payable monthly at Macon, Georgia, the first falling due on June 15, 1904. These notes contained the following clause: "If this note is not paid at maturity, policy No. 155254 issued by the Fidelity Mutual Life Insurance Co. of Philadelphia, for which it is given, shall be

ipso facto null and void, without notice to the maker hereof, and without any act on the part of the company, and shall remain so until restored as provided by its terms." Appended to the signature to the notes was the following: "C/o. M. & B. Ry." The receipt given to the insured provided that "It is understood and agreed that a protested check or past-due note or obligation of any kind is not payment, and that any obligation given in exchange for this receipt, when dishonored or not paid at maturity, shall render this receipt and policy absolutely void." When the notes were given by the insured for the premium on the policy, the number of the policy was not written in the blank space provided in the form for such number. It was inserted in pencil by one of the company's agents at its head office at the time they were received and entered of record.

The insured was taken sick about the last of May or first of June, with typhoid fever, and died on August 7, 1904, at the home of his brother in Greenville, where he had been staying during his sickness. His mother died before he did. On June 15, when the first note fell due, he was seriously sick, and so remained until his death. He was unable during that time to attend to business. Before his sickness he was working under one McLaughlin, who was the agent at Macon for the Macon & Birmingham Railroad Company. The note due June 15 was sent to the Exchange Bank of Macon for collection. It was presented at the office of the Macon & Birmingham Railroad Company, the place where the insured was employed, but he was not there at the time, on account of his sickness. It was not paid. The agent of the railroad company wrote to the insured on the afternoon of June 15, informing him of the presentation of the note and asking if the insured desired it to be paid, and if so that he send an order on the paymaster for the necessary amount. Such an order was sent and received by the agent some four or five days later. He thereupon went to the local agent of the insurance company, and was informed that the note had been returned to the company at Philadelphia. He also inquired of the clerk in charge of the collection department of the Exchange Bank if the latter had on hand for collection a note of the insured; to which the clerk replied that the note had been returned. The railroad agent used the expression, "I made this offer to pay the note the same day that I received order from Mr.

Hipp;" but it did not appear that there was any actual offer or tender. At another time the same witness said, "The order was sent to me for the purpose of getting an advance on salary from C. T. Chappell, paymaster, with which to pay note due for premium on a policy issued by the Mutual Life Insurance Company of Philadelphia. . . I was not ready to pay the note, for the reason that it would have been at first necessary for me to arrange with the paymaster, Chappell, for an advance of salary, if any due Mr. Hipp, my first inquiry being for the purpose of locating the note if still in bank or in possession of the local agent of the Fidelity Mutual Life Insurance Company at Macon, Ga. Not finding the note, no further effort was made to pay it." He also said, "I do not remember how this paper got out of my possession, but I think I gave it to Mr. Henderson [the local agent], but I can not recall any conversation that took place at that time."

About the 16th or 18th of June the insurance company's agent asked the agent of the railroad for the policy, saying that the note issued for the premium had gone to protest. On June 15 the bank closed at the usual hour of two p. m. The note was returned to the company unpaid on June 17. The brother of the insured testified, that he had no knowledge of the maturity of the note until he received a written message from a friend at three o'clock p. m. on June 15, advising him of such maturity, and that the note was in the Exchange Bank; that as soon as he received the notice he called at the bank, at about three o'clock p. m., to pay the note for his brother, but found it closed; that he then went to the office of the local agent of the company, but also found it closed; that he was compelled to return to his home at Griffin that night, but again went to Macon on the morning of June 17, and went to the office of the company's agent and stated to the agent that he had come to take up the note which he understood his brother had for some insurance; that the agent stated that the note had been returned to the company, and that it would be impossible for him to get it; that the witness asked him if he could not give a receipt and accept the money, but the agent said that he could not do so, and that the company knew of the sickness of the insured and had given instructions that the note was to be returned promptly on non-payment. It appeared that the

witness himself was a life-insurance agent. Among other things he said, "I merely took the matter up for my brother from the fact that L̥learned that the note was due on that day. . . I knew that my brother held' a policy, but I did not know anything about when the notes became due, or anything about the premium, anything like that." He testified that he did not tender the money formally to the agent, but informed him that he did not come for any other purpose.

On June 18, the agent of the company at Atlanta wrote to the insured that his note due June 15 was not paid at maturity, "and the policy by its terms is void;" that the non-payment was evidently an oversight, and that the agent trusted that the insured would at once sign and forward to the office the application for revival enclosed, together with the amount of the note. Accompanying this letter was a blank form of application, reciting the non-payment of the note, that the policy by its terms became void, and that the insured desired to revive the policy and warranted that he was in good health and free from any ailment or complaint. No answer appears to have been made to this. The court struck certain allegations in the pleading, and the plaintiff excepted pendente lite. At the close of the evidence the court directed a verdict in favor of the defendant. The plaintiff excepted.

*J. L. Willis* and *S. B. Hatcher*, for plaintiff.

*Goetchius & Chappell*, for defendant.

LUMPKIN, J. (After stating the foregoing facts.)

This case presents the following controlling questions: (1) Did the policy of insurance take effect? (2) If so, did the failure to pay the first of the notes given in lieu of the cash premium required by the policy work a forfeiture? (3) Did the sickness of the insured at the time when the note fell due, and continuing until his death, excuse a failure to pay it and thus prevent a termination of the policy? (4) Did the fact that the note was not payable in bank but was sent for collection through bank, and that no notice was given to the insured personally, but the note was presented at the address appended to his signature, when he was sick in another place, operate to excuse non-payment and prevent a forfeiture? (5) Did the voluntary effort of the brother of the insured, made at his own instance and not as agent for the insured, to find the note on the day when it was due, with the intention

of paying it for the benefit of his brother, excuse non-payment by the insured? (6) Did the other facts shown by the evidence have that effect (7) Did the rider attached to the policy as a part of the contract prevent forfeiture for non-payment of the note? (8) Did the making of a pencil memorandum of the number of the policy in the blank space left in the premium note for such number, after it was signed, render the note invalid, or inadmissible in evidence?

1, 2. The policy provided on its face that the contract should not be operative or binding until the actual payment of the initial premium and delivery of the policy. The company might have stood on this provision. But if, instead of doing so, it delivered the policy, took notes for the initial premium, payable monthly for six months, and gave to the insured a receipt for the premium payable in advance, containing the clause "the above premium settled by note," this was a waiver of payment in cash and an acceptance of the notes in lieu of cash.

Both the policy and the notes expressly provided that if any note given for premium was not paid at maturity the policy should ipso facto be null and void and should so remain until reinstated or restored in the manner provided. While the taking of the notes in lieu of a prepayment in cash waived such prepayment or postponed the time of payment, it did so on the terms agreed upon. It did not operate both to waive the prepayment in cash and also to waive the express terms and conditions on which the postponement of payment was agreed upon. In such a case a failure to pay the notes at maturity would terminate the policy. *Bank of Commerce* v. *New York Life Ins. Co.*, 125 *Ga.*, 552.

3. It is contended that the sickness of the insured when the note fell due was an excuse for non-payment and prevented a forfeiture or termination of the policy. Where personal services are contracted for, sickness rendering their performance impossible may furnish an excuse for non-performance. *Griggs* v. *Swift*, 82 *Ga.* 392; Clark on Contracts (2d ed.), 476-7, §250. Our code declares that if performance is impossible and becomes so by act of God, such impossibility is itself a defense equivalent to performance (Civil Code, §3725). In the absence of statutory provision, the general rule is that where a person creates a charge or

obligation upon himself by express contract, he will not be permitted to excuse himself therefrom by pleading an act of God rendering performance impracticable, if there is no provision in the contract for such a contingency. 1 Am. & Eng. Ency. Law, 588, and cases cited in note 2. "The sickness of the insured is no ground for avoiding the forfeiture of a life policy, or for granting relief in equity against such forfeiture." 19 Id. 51; Klein v. Insurance Co., 104 U. S. 88; Thompson v. Insurance Co., Id. 252. The section of the Civil Code above referred to is a codification, not a legislative enactment, except as it was made so by the adoption of the code. Whatever construction may be put upon it, the payment of a premium on a policy of insurance is not excused by reason of sickness; and under a clause providing that if a premium note is not paid at maturity the policy shall at once terminate, such a termination or forfeiture will not be prevented because the insured is sick and fails to pay his premium note when due. *Sullivan* v. *Connecticut Indemnity Asso.*, 101 *Ga.* 809; *National Life Asso.* v. *Brown,* 103 *Ga.* 382; *American Assurance Asso.* v. *Hardiman,* 124 *Ga.* 379; *Bank of Commerce New York Life Ins. Co.,* 125 *Ga.* 552, supra; Thompson v. Fidelity Mutual Life Ins. Co. (Tenn.), 92 S. W. 1098, 1112. The policy and the notes expressly provided that the former should terminate and become void upon non-payment at maturity of any of the latter. To hold that this should not be the case if the insured were sick when one of the notes fell due would have the effect to continue the contract of insurance by sickness, not by payment, in spite of the express contract of the parties.

4-7. It was urged that the note was not made payable at bank; that no notice of its being placed there or sent through bank for collection was given to the insured; and that there was no sufficient presentation to him. It is immaterial whether or not the insured was notified that the note would be placed in bank for collection, if in fact he had a sufficient opportunity to pay it according to its terms. It was on its face made payable in Macon, Georgia. It was presented for payment at the address appended by him to his signature. He was absent from the city and payment was not made. No previous arrangement had been made to have the note paid when presented at such address. No inquiry was made by the insured or any agent for him of the company or any

of its agents as to where the note was on that day or before. The truth is evident that the insured was sick and made no effort to find the note or to pay it.

It is said that the note, not being payable at bank, should not be construed to be payable within banking hours only, and that the insured had the entire day within which to make payment. This may be true, but he made no effort to pay at any time during the day. He could not say that he was prevented from paying by the closing of the bank, since he made no effort to pay at all; and his administrator is in no better position than that in which he would have been had he lived. His brother testified that he (the brother) heard that the note was in bank and went there after banking hours, but found the bank closed; and also that he went to the office of the local agent of the company, but found it also closed. He was a mere volunteer, and not the agent or representative of the insured. His voluntary going to the bank and to the office of the local agent was not the act of the insured or of any agent for him. He did not in fact pay the note or make further effort or offer to pay it, though apparently both the officers of the bank and the agent of the company were in Macon. He testified that his intention was to pay the note for his brother. But his mere intention as a volunteer, not carried into effect, or even reaching the point of a tender, did not suffice to keep the policy alive. He testified that he proposed to pay the local agent of the company two or three days later, after the note had been dishonored and returned to the company. On this subject the evidence was conflicting; but taking his version of it, his proposal did not reinstate the policy. The contract provided how that could be done, by application on the part of the insured, under certain conditions. The local agent also appears to have been without power either to reinstate the policy or waive the forfeiture.

For similar reasons the sending by the insured to the agent of the railroad, under whom he was employed, of an order to pay the amount from his salary, and the inquiry by the agent at the bank as to where the note was, resulting in ascertaining that it had been unpaid when due and had been returned to the company (this occurring several days after the maturity of the note), neither waived the forfeiture nor reinstated the policy. More-

over, the agent testified that he did not make any effort to pay, but merely inquired about the note; and that if it had been there, he intended to arrange for an advance of money to the insured on account of his salary.

8-9. It was claimed that what was termed the "Ordinary life elective life rider" prevented a forfeiture of the policy. This "rider," which was attached to the policy and made a part of it, provided, among other things, that upon acceptance by the company of due and satisfactory proof of the total and permanent blindness or deafness of the insured, or that he had become totally and permanently incapacitated either by accident or bodily or mental disorder, in lieu of other benefits and advantages under the policy, he should be entitled to either one of two options. One was that from the date of such proof the premiums payable for the remaining years should cease, or be remitted during the continuance of the incapacity, and the insurance should be payable as an endowment at the age of eighty, or at death if before that age. The second option was to take a life annuity. In order for either one of these options to be exercised it was necessary that due and satisfactory proof should be made to the company. This was not done; nor was there any exercise of the option. Nor do we think that the total and permanent incapacity referred to meant merely that if an insured person was taken sick and died in a few weeks without recovering, the failure to pay premium notes falling due pending the sickness would be excused on that account. The expression that premiums payable "for the remaining years shall cease," as well as the other provisions above referred to, negative any such idea.

10. The notes were given in lieu of prepayment of the cash premium. There is no contention that they were not given for the premium on the policy sued on. The evidence on that subject is uncontradicted. If these notes were invalid for any reason, then the cash premium had not been prepaid as required by the policy. If the notes were invalid, there was no reason to claim that the insurance ever took effect. The whole case of the plaintiff rested on the fact that the first premium was either paid in cash or settled by giving these notes. The mere insertion of the pencil memorandum of the number of the policy in the blank was not such an alteration as to invalidate the notes or to cause their

rejection from evidence. There is no pretense that this was done with any fraudulent purpose, or that it really altered the effect of the notes, or that the contract could not be enforced as well without the insertion. See Civil Code, § 3702. The policy having terminated, the direction of a verdict for the defendant was proper.        *Judgment affirmed. All the Justices concur.*